NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | **Hon. Dennis M. Cavanaugh** |
| Plaintiff, | : | |
| | : | **OPINION** |
| v. | : | |
| | : | Civil Action No. 10-CR-851 (DMC) |
| STEPHEN DEPIRO, a/k/a "Beach," | : | |
| ALBERT CERNADAS, a/k/a "The Bull," | : | |
| NUNZIO LAGRASSO; | : | |
| RICHARD DEHMER a/k/a "Dickie," | : | |
| VINCENT AULISI a/k/a "The Vet," | : | |
| THOMAS LEONARDIS a/k/a "Tommy," | : | |
| ROBERT RUIZ a/k/a "Bobby," | : | |
| MICHAEL TRUEBA a/k/a "Mikey," | : | |
| SALVATORE LAGRASSO, | : | |
| MICHAEL NICOLOSI, | : | |
| ROCCO FERRANDINO, and | : | |
| JULIO PORRAO | : | |
| | : | |
| Defendants. | : | |
| | : | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon Motions by Defendants Julio Porrao ("Porrao")

(ECF No. 185), Michael Trueba ("Trueba") (ECF No. 190), Salvatore LaGrasso ("S. LaGrasso")

(ECF No. 191, 192, 193, 196), Albert Cernadas ("Cernadas") (ECF No. 194), Richard Dehmer

("Dehmer") (ECF No. 195), Stephen Depiro ("Depiro") (ECF No. 197), Rocco Ferrandino

("Ferrandino") (ECF No. 198), Thomas Leonardis ("Leonardis") (ECF No. 199), Vincent Aulisi

("Aulisi") (ECF No. 200), Nunzio LaGrasso ("N. LaGrasso") (ECF No. 201) and Robert Ruiz

1

("Ruiz") (ECF No. 202) (collectively, "Defendants").  Oral argument was heard before the Court on February 12, 2012. After carefully considering all the written submissions and arguments of parties, based on the following and for the reasons expressed herein, Defendants' motions are **granted in part and denied in part**.

## I.      BACKGROUND

United States v. Depiro is 103 count indictment against 14 individuals. (See Second Superseding Indictment, Dec. 12, 2012, ECF No. 149).  The first count of the 103 count indictment charges a racketeering conspiracy against four individuals, Depiro, Cernadas, N. LaGrasso and Dehmer and 140 Racketeering Acts. Racketeering Acts 1 through 137 allege various extortions against Cernadas (Racketeering Acts 1-94) and N. LaGrasso (Racketeering Acts 95- 137). Racketeering Acts 138 through 140 allege various gambling offenses against Dehmer and Depiro.  Count 2 charges Dehmer and Depiro with a second racketeering conspiracy to collect unlawful debts.

Count 3 alleges a non-RICO extortion conspiracy against 12 individuals: relevant to the motions at hand, Dehmer, Depiro, Cernadas, N. LaGrasso, S. LaGrasso, Leonardis, Ruiz and Trueba. Counts 4 through 89 charge the substantive offenses of extortion on various dates involving various "John Does."  The extortion scheme is charged in the Count 1 RICO conspiracy and Count 3 Hobbs Act conspiracy.  The Count 1 RICO defendants, Depiro, Cernadas and N. LaGrasso, are alleged co-conspirators of the Count 3 non-RICO defendants (Aulisi, Leonardis, Ruiz, Trueba, S. LaGrasso, Nicolosi, Ferrandino and Porrao). Among the numerous alleged extortion victims of this scheme, the Indictment alleges eight specific persons, identified as John Doe #1 through #8, who were extorted by both RICO and non-RICO defendants at

2

varying times over the length of the conspiracy.  The substantive extortion counts (Counts 4 through Counts 89) all arise out of the same alleged extortion conspiracy, and are alleged against RICO and non-RICO defendants alike.  In addition, Count 90 charges Ruiz with obstruction of justice arising from the actions he allegedly took to conceal the extortion scheme when law enforcement's investigation became overt. Counts 91 through 103 charge various gambling offenses against Dehmer and Depiro.

All Defendants are charged with extortion; none are charged with crimes different in nature or degree.  The indictment alleges that both types of conduct at issue, extortion and illegal gambling, were perpetrated on behalf, and for the benefit, of the Genovese organized crime family.

## II.   DISCUSSION

Defendants make multiple pretrial motions. The Court will address them each in turn.

### A. Motion for Severance

DePiro, Cernadas, Dehmer, Aulisi, Leonardis, Ruiz, Trueba, S. LaGrasso, Ferrandino, and Porrao move for the Court to sever the extortion conspiracy count and its related offenses from the RICO counts and other unrelated charges to ensure a fair trial. At oral argument, the Court determined that all Defendants were seeking two trials: one trial for Counts 3-89, and another trial for Counts 1-2 and 90-103. S. LaGrasso, Dehmer, Ruiz and Porrao also request that their individual trials be severed from the other defendants.

Federal Rule of Criminal Procedure 14(a) allows for a district court to order severance if the joinder of offenses will prejudice a defendant.  See FED. R. CRIM. P. 14(a).  The decision whether to sever claims is a highly discretionary one.  United States v. Urban, 404 F.3d 754, 775

(3d Cir. 2005). The public interest generally favors joint trials. United States v. Eufrasio, 935 F.2d 553, 568 (3d Cir. 1991). Indeed, a court should grant a severance "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent a jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 537 (1993). Defendants seeking a severance bear an especially "heavy burden." United States v. Console, 13 F.3d 641, 655 (3d Cir. 1993). "[D]efendants are not entitled to a severance merely because they may have a better chance for an acquittal in separate trials." Urban, 404 F.3d at 775. The mere possibility of prejudice is also not enough. See, e.g., United States v. Walker, 392 Fed. Appx. 919, 926 (3d Cir. 2009) (rejecting arguments for severance that "evidence was so horrific it had to spillover into the jury's mind" and that "specter of violence against witnesses was highly prejudicial."); see also United States v. Reicherter, 647 F.2d 397, 400 (3d Cir. 1981) ("Mere allegations of prejudice are not enough"). Nor is a severance warranted "solely because the evidence in regard to certain counts is more damaging than evidence in regards to other counts." United States v. Bornman, 559 F.3d 150, 156 (3d Cir. 2009). Instead, in order to obtain a severance, a defendant must demonstrate that "not only would the court abuse its discretion if it denied severance, but also that the denial of severance would lead to clear and substantial prejudice resulting in a manifestly unfair trial." United States v. Lore, 430 F.3d 190, 205 (3d Cir. 2005).

Defendants argue that at its core, the Government's case is a Hobbs Act extortion case, as such allegations comprise the vast majority of the Indictment, spanning Counts 3 through 89. (See e.g., Ferrandino Br., ECF No. 198; Cernadas Br., ECF No. 194). The Defendants argue that the "spillover prejudice" that would occur if all counts were tried together would handicap both

4

the RICO and non-RICO Defendants at trial. Cernadas, with whom Depiro joins, illustrates the main argument:

> The sensational allegations about the history of organized crime and its use of violence contained in the racketeering charge will interfere with Mr. Cernadas's ability to achieve a fair trial on the core allegations in the case – the extortion conspiracy and related substantive extortion offenses – as well as the ability of his co-defendants who are not named in the racketeering offenses to obtain a fair trial on the offenses with which they are charged.

(Cernadas Br. 9-10, ECF No. 194)

Defendants argue there will be spillover prejudice in three regards: 1) from the gambling and the references to gambling; 2) from the extortionate collection of gambling debts as opposed to the extortion of union members; and 3) references to organized crime and the Genovese family, and the manner and means in the RICO counts (Counts 1 and 2). (See Transcript of Oral Argument ("Tr."), Feb. 12, 2013, 12:21-25 - 13:1-2).

The Court disagrees. Defendants claims of prejudice are insufficient to support severance. Merely alleging prejudice—including allegations of spillover prejudice similar to those made here—is insufficient to support a severance request.  See, e.g., United States v. Walker, 392 Fed. Appx. 919, 926 (3d Cir. 2009) (rejecting arguments for severance that "evidence was so horrific it had to spillover into the jury's mind" and that "specter of violence against witnesses was highly prejudicial."); United States v. Kenny, 462 F.2d 1205, 1218 (3d Cir. 1972) ("the mere possibility that in a joint trial some evidence may be admitted against one defendant which is inadmissible against another is not in itself a sufficient reason for multiple trials growing out of a closely related series of transactions. The prospect that certain evidence will be admissible against one defendant but not against another is a feature of all joint trials.") Here, there is substantial overlap

5

of witnesses, co-conspirators and evidence. The charges against Defendants are also consistent:

all Defendants are charged with some type of extortionate conduct, whether that be the extortion

of dockworkers or the extortionate collection of credit.  Thus this case does not pose a risk of

"spillover" prejudice to "defendants whose alleged activities did not include the sort of violent or

heinous offenses with which some of their brethren are charged." United States v. Gallo, 668 F.

Supp. 736, 750 (E.D.N.Y. 1987). The Government also notes that even if the trials were severed,

it would be permitted to prove the role of each co-conspirator, the relationships between co-

conspirators and the objectives of the conspiracy at a separate trial.  See Zafiro, 506 U.S. 534,

540 (1993) ("While an important element of a fair trial is that a jury consider only relevant and

competent evidence bearing on the issue of guilt or innocence, a fair trial does not include the

right to exclude relevant and competent evidence.") The Government argues it is entitled to

present a complete picture of the ILA extortion conspiracy, including that the objective of the

conspiracy was to enrich the Genovese organized crime family, regardless of whether a RICO or

Hobbs Act conspiracy charge is alleged.  See, e.g., United States v. Heilman, 377 Fed. Appx.

157, 199 (3d Cir. 2010) (holding "joint trials of defendants charged in a single conspiracy aid the

fact finder in determining the full extent of the conspiracy.") The Government notes "regardless

of status differences between members in the same conspiracy, at the end of the day, it's the same

conspiracy. The objectives of the conspiracy are exactly the same. " (Tr. 43: 5-7).  The Court

agrees.

 Additionally, any risk of prejudice arising from a joint trial can be cured by appropriate

limiting instructions. Defendants argue that the amount of limiting instructions and the frequency

with which a jury at trial would hear them would be unduly confusing and ultimately ineffective.[1] This Court disagrees. Here, the evidence is of the type that can be cured with proper instructions. Such instructions regularly direct jurors "to compartmentalize the evidence by considering the evidence separately as to each defendant and each count." United States v. Lore, 430 F.3d 190, 205-06 (3d Cir. 2005).  In Zafiro, for example, the Supreme Court affirmed that district court's denial of severance where the court "instructed the jury that it must 'give separate consideration to each individual defendant and to each separate charge against him.  Each defendant is entitled to have his or her case determined from his or her own conduct and from the evidence that may be applicable to him or to her.'" Zafiro, 506 U.S. at 541 (internal citation omitted). This Court in United States v. Bergrin agreed: "Bergrin's allegations of prejudice, while perhaps having some basis, are not of such a degree that they necessitate severance, especially when the Court is more than capable of fashioning an appropriate limiting instruction if needed." (United States. v. Bergrin, Transcript of Sept. 12, 2012, See Exhibit A to Gov.'s Opp'n Br. ECF No. 223-1 at *44.)

---

[1]At oral argument, Defendants pointed the Court's attention to a Sixth Circuit case, United States v. Blackwell, 459 F.3d 739, 762 (6th Cir. 2006) (internal citations omitted), where the Court stated:

> Typically, the danger of guilt transference "can be cured with a cautionary instruction to the jury that if it finds multiple conspiracies, evidence relating to one conspiracy cannot be considered in examining another conspiracy." However, the more evidence presented at trial that is unrelated to the defendant's conduct, or a conspiracy in which the defendant took part, the less likely instructions are to cure the danger of guilt transference.

Blackwell dealt with a prosecution for insider trading, and the allegation on appeal was a variance; that the evidence established two separate conspiracies rather than one. The jury was instructed " if acts were done or statements were made by someone whom you do not find to be a member of the conspiracy, they may be considered by you as evidence only against the person who did the acts or made the statement."  However, the Court goes on to say that "we presume the jury followed these instructions" and concluded that the jury did not improperly "transfer guilt" to Blackwell from the other defendants "without first finding that the defendant in question conspired with Blackwell." Id. at 763.

Bergrin had claimed "prejudice on the Kemo Murder Counts because of the volume and nature of the evidence that may come in on the RICO counts," but the Court found "that the jury can compartmentalize the evidence of each of the charges and ensure a fair trial" despite the "large volume of evidence and numerous witnesses that the jury will hear and consider on various claims."

Additionally, in the case at bar, the potentially prejudicial Rule 403 and 404(b) evidence presented at trial will only relate to some of the Defendants. Any evidence presented against one Defendant would be distinguishable from the other Defendants; for example, there is no prejudice to Defendant #2 if a victim testifies that Defendant #1 extorted him. And, if limiting instructions are given, the Third Circuit has held that juries are presumed to follow Court directions absent compelling evidence that the volume of evidence will overwhelm and confuse the jury.  See, e.g., United States v. Hakim, 344 F.3d 324, 330 (3d Cir. 2003) ("We begin our analysis with the presumption that juries follow instructions given by district courts." (citing United States v. Newby, 11 F.3d 1143, 1147 (3d Cir. 1993)).

### B. Motion for Bill of Particulars

DePiro, Cernadas, N. LaGrasso, Dehmer, Aulisi, Leonardis, Ruiz, Trueba, S. LaGrasso, and Ferrandino move for a bill of particulars. Specifically, most Defendants ask for three categories of information: 1) the identity of the John Does in the indictment; 2) the identity of all unindicted co-conspirators and aiders and abettors; and 3) the date, time and place pertaining to each alleged extortion.

Federal Rule of Civil Procedure 7(f) provides a court with discretion to direct the

government to file a bill of particulars. The "purpose of a bill of particulars is to inform the defendant of the nature of the charges brought against him to adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense." United States v. Addonizio, 451 F. 2d 49, 63-64 (3d Cir. 1971) (citations omitted). It is "firmly established" that "a defendant is entitled neither to a wholesale discovery of the Government's evidence . . . nor to a list of the Government's prospective witnesses." Id. at 64 (citations omitted); United States v. Kenny, 462 F.2d 1205, 1212 (3d Cir. 1972) (noting a defendant may not present a "set of detailed interrogatories in the guise of a bill of particulars."); United States v. Armocida, 515 F.2d 49, 54 (3d Cir. 1975) (defendant's "request for the 'when, where and how' of any overt acts not alleged in the indictment was tantamount to a request for 'wholesale discovery of the Government's evidence,' which is not the purpose of a bill of particulars").

The government argues that Defendants have been supplied with the central facts of this case via the details set forth in the Indictment and the substantial discovery that has been produced to date. See United States v. Vastola, 670 F. Supp. 1244, 1269 (D.N.J. 1987). This Court agrees. As the functions of a bill of particulars are "more akin to the functions of an indictment than to a discovery," Defendants' motions are denied. United States v. Smith, 776 F.2d 1104, 1111 (3d Cir. 1985).

### C. Motion to Suppress Wiretaps

Cernadas, N. LaGrasso, Dehmer, Aulisi, S. LaGrasso, and Ferrandino all move to suppress evidence of intercepted recorded conversations obtained from four sets of Title III applications. (1) Six cell phones from July 2009 through February 2010; (2) five cell phones

from October 2006 through May 2007; (3) "roving" wire communications to and from various public telephones in New Jersey from August 1998 through November 1998 targeting Tino Fiumara; and (4) Seven cell phones and four locations with electronic bugs during 2000 through 2002. N. LaGrasso, with whom Cernadas, Depiro and Ferrandnio join, moves to suppress all the above reference Title III interceptions and the fruits of the evidence on the grounds that the applications were statutorily and constitutionally deficient.  Dehmer argues that the wiretaps should be suppressed because no probable cause existed as there were unreliable cooperating witness; and also joins in with other Defendants motions.

Probable cause to authorize a wiretap "is established if the 'totality of circumstances' contained in the affidavit indicates a probability of criminal activity and that evidence of the criminal activity could be obtained through the use of electronic surveillance."  United States v. Ambrosio, 898 F. Supp. 177, 181 (S.D.N.Y. 1995) (quoting United States v. Rowell, 903 F.2d 899 (2d Cir. 1990)); see, e.g., United States v. Squitieri, 688 F. Supp. 163, 172 (D.N.J. 1988) (discussing the "totality of the circumstances" test as the appropriate standard for evaluating the probable cause requirement for a wiretap application).  Probable cause exists if the facts in the supporting affidavit are "sufficient to warrant a prudent man in believing" that evidence of a crime would be disclosed through the proposed wire surveillance.  Beck v. Ohio, 379 U.S. 89, 91 (1964). "Any doubts as to the existence of probable cause should be resolved in favor of upholding the authorization." Ambrosio, 898 F. Supp. at 181.

First, N. LaGrasso argues that the 2009-2010 wiretaps should be suppressed because the applications misrepresented necessity. He argues the applications failed to properly advise the wiretap judge of the cooperation and breadth of the multi-agency parallel investigation, and that

10

the Government did not use alternative means prior to getting the wiretap. Additionally, N. LaGrasso argues that the wiretap was not properly minimized.

Regarding to the 2006-2007 wiretap, N. LaGrasso argues that the Government lacked probable cause and necessity to justify the original wiretap.[2] He also argues that normal investigative techniques were not exhausted before the government applied for the October 17, 2006 Ragonese phone wiretap application. N. LaGrasso also alleges that the 2006-2007 affidavits in support of wiretaps may have failed to disclose all cooperating witnesses and sources.

N. LaGrasso requests that this Court suppress all interceptions resulting from the August 20, 1998 Order, and its extension Orders, to intercept roving wire communications by Tino Fiumara at various pay telephone facilities in New Jersey. Defendant argues that the roving wiretap Order failed to comply with the requirements of 18 U.S.C. § 2518(12)[3].

N. LaGrasso also argues that the 2000-2002 wiretap interceptions should be suppressed as "during the review of the nearly four decades worth of discovery, it has become evident that the wiretap judges may not have been provided with all of the relevant information pertaining to alternative investigative techniques, cooperating and potential undercover witnesses." (N. Lagrasso's Mem., ECF No.201).

---

[2]The 2006-2007 wiretaps included five sets of interceptions on five separate cell phone numbers, subscribed to Patsy Ragonese ("Ragonese phone"), Daniel Dellisanti ("Dellisanti phone"), Louis Rizzo ("Rizzo phone"), Mary Hayden ("Hayden phone") and Moe Mathewes ("Mathewes phone").

[3]That section provides in relevant part: "An interception of a communication under an order with respect to which the requirements of subsections (1)(b)(ii) and (3)(d) of this section do not apply by reason of subsection (11)(a) *shall not begin until the place where the communication is to be intercepted is ascertained by the person implementing the interception order.*" (emphasis added).

The Government asks the court to deny all motions to suppress wiretaps. It argues the wiretap affidavits demonstrated probable cause and amply discussed the necessity of the wiretaps.

As to the 2009-2010 wiretaps, the Government argues that the affidavits established probable cause, as the initial wiretap affidavit set forth a detailed recitation of information that had been provided by a cooperating witness regarding Dehmer's and Depiro's association with the Genovese crime family, the transcript of an excerpt of a consensually recorded telephone call pertaining to gambling activity, as well as toll analysis that established probable cause that Dehmer was using the telephone to manage his bookmaking and poker businesses, and that he was engaged in conversations with Depiro regarding racketeering activity. With regards to necessity, the Government contends that the affidavits presented the alterative methods considered and used, and explained the shortcomings of each technique in the context of the investigation. In sum, the Government argues that the wiretap affidavits amply and accurately discussed the alternative investigative techniques and "inform[ed] the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods.'" United States v. Torres, 901 F.2d 205, 231 (2d Cir. 1990) (internal quotations omitted).

Whether the minimization requirements of Title III set forth in 18 U.S.C. § 2185(5) have been met is a fact specific inquiry that focuses on the reasonableness of the actions of the agents conducting the surveillance. See Scott v. United States, 436 U.S. 128, 140-41 (1978). N. LaGrasso argues that a high percentage of the calls recorded from his cell phone were personal in nature, and constituted pervasive violations. To determine if a conversation is or is not pertinent,

12

the Supreme Court has made clear that a reviewing court should determine whether the agents' actions were objectively reasonable in light of the facts and circumstances that confronted them at the time, and not based upon the agents' subjective intent. Scott, 436 U.S. at 136-37. Scott also held that "when the investigation is focusing on what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise." Id. at 140. Further, both the Third and Second Circuits have held that calls "lasting less than two minutes need not be minimized. . . . Thus, because all calls between Giordano and Jones were less than two minutes in length, the government was not required to minimize them." United States v. Giordano, 259 F. Supp. 2d 146, 155 (D. Conn. 2003) (citing United States v. Capra, 501 F.2d 267, 276 (2d Cir. 1974) (observing that two minutes is "too brief a period for an eavesdropper even with experience to identify the caller and characterize the conversation") (internal quotation marks omitted)); accord Armocida, 515 F.3d at 42-46; United States v. Yarbrough, 527 F.3d 1092, 1098 (10th Cir. 2008)("[I]n analyzing the reasonableness of the government's minimization efforts, we exclude calls under two minutes.").

For the 2006-2007 wiretaps, the Government argues that it has met its burden to show probable cause and necessity to justify the Ragonese phone wiretap and that there was probable cause to intercept the Hayden phone. Additionally, the 2006-2007 wiretap affidavits set forth a full recitation of the facts. The Government claims there were numerous sources providing information about Ragonese's and Dellisanti's criminal activity from 2001 through 2006 and there was substantial corroboration of that information and the continued use of the Ragonese Phone in furtherance of that activity, Judge Jones had a substantial basis for concluding that they were engaged in ongoing criminal activity. The continuous, ongoing nature of the subjects'

13

criminal activity also provides a substantial basis for Judge Jones's conclusion that the information provided was not stale, as one of the wiretap cases upon which the defendants rely provides.  See United States v. Rowell, 903 F.2d 899, 903 (2d Cir. 1990) ("Given the continuous nature of narcotics conspiracies and Rowell's statements to the Florida undercover officer about his on-going marijuana distribution operation, the approximately 18-month delay between procuring the informants' statements and seeking the wiretap warrant did not render the information stale."). The 10/17/06 Lewis affidavit establishes probable cause to believe that interception of the Ragonese Phone would relate to the specified offenses.

Defendants also argue that the Government failed to exhaust other investigative techniques, specifically the use of surveillance, subpoenas and witness interviews, before applying for Title III interception of the Ragonese Phone.  The Government states that in this case, the 10/17/06 Lewis Affidavit provided Judge Jones with a substantial basis for her conclusion that other investigative techniques are not feasible.  Here, the affidavit detailed in several places the subjects' methods of avoiding surveillance and the inability of law enforcement to overhear criminal conversations, including the subjects' engaging in walk-talks and meeting in public places apart from others, despite the fact that both meeting participants had just spoken on the telephone.

Defendants argue that evidence from the Hayden Phone should be suppressed because (1) the application flowed from the allegedly deficient affidavits for the Ragonese Phone and other allegedly deficient Title III applications; (2) the Hayden Phone Title III application lacked probable cause in that it failed to establish that interceptions would relate to the specified offenses; and (3) alternative investigative techniques were not exhausted.  (N. LaGrasso Mem., at

14

39-41).  Defendants also argue that the suppression of the Hayden Phone "also warrants suppression of the Mathewes Phone recordings as improperly gained evidence." (Id. at 39).  The Government alleges that the interception of the Ragonese Phone was lawful.  Moreover, the Government claims that agents were entitled to rely, and did rely in good faith, on Judge Jones's authorization of the interception of the Ragonese, Dellisanti and Rizzo Phones.  As with the Ragonese Phone, the defendants offer no evidence that agents acted in bad faith in using interceptions from the Dellisanti and Rizzo Phones in applying for Title III interception of the Hayden Phone or the Mathewes Phone. The Government also states that the defendants claim that the Government relied upon the information included in the earlier Ragnoese phone tap and subsequent Rizzo and Dellisanti phone taps to support the Hayden tap is untrue. The Government then provides independent evidence establishing probable cause that communications intercepted over the Hayden Phone would relate to the specified offenses, including information that Coppola and other Genovese members were involved in illegal gambling. In addition, the 2/15/07 Lewis Affidavit detailed information corroborated by numerous sources that Paul Coppola was collecting extortion payments relating to the Genovese family's (including Michael Coppola's) extortion of the unions and businesses servicing the New Jersey ports and that Paul Coppola and Dellisanti engaged in numerous anti-surveillance techniques, including using payphones, calling cards and pagers in order to speak with the person using the Hayden Phone, during the time period sources claim  that Paul Coppola received these extortion payments.

Defendants also complain that the Hayden Phone affidavit failed to establish probable cause that a targeted individual would use the phone during the period requested for interceptions.  (N. LaGrasso Mem., at 40).  The Government counters, stating that this allegation

plainly lacks merit as the 2/15/07 Lewis Affidavit is "replete with facts establishing current criminal contact among the subject individuals."

Finally, Defendants claim that the wiretap affidavits in 2006 and 2007 "may have failed to disclose all cooperating witnesses and sources," accusing the government of appearing to "cherry-pick information" and failing to "disclose the full scope and purpose of the investigation." (N. LaGrasso Mem., at 41). The Government argues that the Defendants allege no facts to support their speculative assertions and their demand for the Government to "verify" that the entire federal government and "other law enforcement agencies were not employing any additional cooperating witnesses and/or undercover agents at the time of the affidavits for those wiretaps" (N. LaGrasso Mem., at 42) is without a basis in law.

The Government next contends that the 1998 "roving wiretap" was not overbroad and satisfied the requirements of 18 U.S.C. § 2518(12) and the Fourth Amendment.

Defendants argue that the New Jersey Roving Wiretap Orders failed to stipulate that no interception could occur unless visual surveillance indicated that Tino Fiumara was present. (N. LaGrasso Mem., at 44). Defendants argue the orders therefore violated the requirements of 18 U.S.C. § 2519(12) and failed to meet the particularity requirements of the Fourth Amendment. (Id.). The New Jersey Roving Wiretap Orders contain the following language:

> IT IS . . . ORDERED that Special Agents of the Federal Bureau of Investigation ("FBI"), and individuals operating under contract with the Government under the supervision of the FBI supervising agent are authorized and directed, <u>consistent with the Application approved by an appropriately designated official of the Criminal Division, United States Department of Justice</u>, whom the Attorney General has specifically designated to exercise the power conferred by 18 U.S.C. § 2516, to . . . intercept and record roving wire communications to and from various and changing pay telephones located in Ocean and Monmouth Counties, New Jersey and utilized by TINO RICHARD FIUMARA.

16

(N. LaGrasso Exs. EE at ILA 2192-93, FF at ILA 2328-29, and GG at ILA 2507-08) (emphasis added). The Government argues that based on this language, the wiretap order clearly incorporates the contents of the underlying applications, which limits the agents' ability to intercept Tino Fiumara's communications to instances in which Fiumara is confirmed, by physical surveillance, to be using one of the New Jersey payphones equipped with eavesdropping equipment. (See, e.g., ILA 2308 ("interception will only commence when an agent engaging in physical surveillance observes TINO RICHARD FIUMARA at a pay telephone or entering a building . . . where he is believed to have used a pay telephone in the past")). Furthermore, the applications also contain provisions calling for the immediate suspension of interceptions when "it is determined through voice identification, visual observation, or otherwise, that TINO RICHARD FIUMARA, when identified, is not a participant in the conversation." (Id.). In sum, the government argues that because the New Jersey Roving Wiretap Orders incorporate the supporting applications, which include the specificity required by 18 U.S.C. § 2518(12) and the Fourth Amendment, they are not unconstitutionally overbroad and should not be suppressed.

Defendants assert that the wiretaps from the waterfront investigation conducted in 2000 to 2002 should be suppressed. The Government argues that as an initial matter, none of the Defendants in this case have standing to challenge these wires as none of them were intercepted. In addition, the unsupported assertion that the wiretap applications failed to provide the judges with all relevant information regarding necessity and possible sources of information are vague, speculative and do not form a basis for suppression or further inquiry.

This Court agrees with the Government's characterization of the affidavits and wiretap applications, and thus denies Defendants' motions to suppress the various wiretaps.

### D. Motion for Additional and Immediate Production Brady, Giglio, Jencks Act and 404(b) Material

Defendants Depiro, Cernadas, Aulisi, N. LaGrasso, Leonardis, Ruiz, Trueba, Ferrandino, and Porrao make various motions in relation to discovery material.

Defendants argue that it is a "basic proposition of law that the Government has an obligation to provide defense counsel with evidence that is in its possession, custody and control, that relates to its obligations under <u>Brady</u> and <u>Giglio</u>. . . and Jencks, and also impacts its obligation under Rule 16(a)(1)(E) as it pertains to this case." (Tr. 52:9-15).

In <u>Brady</u>, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963). In <u>Giglio v. United States</u>, 45 U.S. 150, 154 (1972), the Supreme Court held that the government must also disclose material which affects the credibility of a potential witness. The Jencks Act requires the Court, on a defendant's motion, to order the government to produce witness statements "[a]fter a witness called by the United States has testified under direct examination." 18 U.S.C. § 3500(b).

As a threshold matter, the Court notes that the Government has acknowledged their obligations in regards to <u>Brady</u> and Jencks Act material. The Government recognizes the "salutary practice" of "delivering Jencks material to defense counsel sufficiently in advance of the conclusion of direct examination to obviate trial interruptions." <u>Murphy</u>, 569 F.2d at 773 n.5. In this case, given the number of witnesses expected to be called, the Government has agreed to produce Jencks material at least one week before the testimony of each witness. The Court so

18

orders. Regarding to <u>Brady</u> and <u>Giglio</u> material in the Government's actual possession, the Court expects the Government to fulfill its obligations in the appropriate time. The Government will disclose all <u>Giglio</u> material at least one week prior to each witness's testimony.

Additionally, at this time, the Government has not determined what, if any, Rule 404(b) evidence it intends to introduce at trial. (ECF No. 223).   The Government has acknowledged its obligation to make pre-trial disclosure of such information, and consistent with the practice of this Court will do so at least ten (10) days before trial if it determines that it will seek to offer any evidence under that rule.

Finally, in their motions, and more succinctly at oral argument, Defendants argued that the Government, in their cooperation with other government agencies, has not fully disclosed all the relevant evidence that Defendants are entitled to under <u>Brady</u>, <u>Giglio</u>, and the Jencks Act. Specifically, N. LaGrasso requests "any and all information developed by the Waterfront Commission of New York Harbor during the time frame charged in the Indictment pertaining to the charges." (ECF No. 201 at 6).  The Government states in their Opposition papers:

> The defendants are simply incorrect to assert that New Jersey authorities were 'working with' the federal investigators tasked with the investigation. In fact, there was at no time a joint investigation into the Genovese crime family's waterfront rackets by the state and federal authorities. Rather, although the investigators occasionally shared limited information, the law enforcement officials working on their respective state and federal investigations did not have real-time access to the information gathered by the other, and the federal government was not in a position to direct the state investigators.

N. LaGrasso notes "when you put the superceding Indictment together with the original Indictment, there are 18 defendants." (Tr. 57:15-17). N. LaGrasso argues that "the Waterfront Commission has played an active role in the investigation," and at oral argument, produced a

document from the Waterfront Commission report for the 2010-2011 fiscal year. (See The

Waterfront Commission of New York Harbor Annual Report 2010-2011 ("Commission

Report"), available at: http://www.wcnyh.org/docs/WCNYH_2011_Annual_Report.pdf). The

report states:

> [T]he Commission has not only become the central repository of information about
> criminality and security in the Port of New York - New Jersey, but also a skilled
> investigative agency, highly regarded by our law enforcement partners. This year, the
> Commission led or significantly participated in investigations and prosecutions that
> resulted in the indictment of key organized crime figures and corrupt union officials.
> Working with New York and New Jersey state and federal authorities, the
> Commission engaged in court-ordered electronic and physical surveillance, executed
> search warrants and developed confidential sources and informants which resulted
> in the arrest of 160 individuals, including 18 in the highly publicized January 2011
> "mob takedown." The Commission provided critical records, surveillance reports and
> photographs and was involved in the investigative and prosecutorial planning of that
> matter. Participation was not limited to our detectives alone, as Commission
> attorneys conducted over forty interviews under oath to supplement the criminal
> investigations.

Prosecutors have an obligation to make a thorough inquiry of all enforcement agencies

that had a potential connection with the witnesses. United States v. Thornton, 1 F.3d 149, 158

(3d Cir. 1993). However, "prosecutors are not required to undertake a 'fishing expedition' in

other jurisdictions to discover impeachment evidence. For example, prosecutors are not obligated

to learn of all information 'possessed by other government agencies that have no involvement in

the investigation or prosecution at issue.'". United States v. Risha, 445 F.3d 298, 304 (3d Cir.

2006)(quoting United States v. Merlino, 349 F.3d 144, 154 (3d Cir. 2003)).

The Third Circuit has held that, under certain circumstances, evidence possessed by state

agents may be "constructively possessed" by a federal prosecutor such that the prosecutor has a

duty to obtain that evidence and disclose it to the defense. See United States v. Risha, 445 F.3d

298, 303-06 (3d Cir.2006). Constructive possession has been defined by the Third Circuit "to mean that although a prosecutor has no actual knowledge, he should nevertheless have known that the material at issue was in existence. Accordingly, we consider whether the prosecutor knew or should have known of the materials even though they were developed in another case." United States v. Joseph, 996 F.2d 36, 39 (3d Cir.1993) (emphasis added).

In Risha, the Third Circuit considered whether it was proper to impute to a federal prosecutor the knowledge of state agents that a key witness who had testified against Risha in a federal criminal case expected leniency for an unrelated state criminal charge in return for his cooperation in the federal case. Risha 445 F. 3d. The key in Risha is that no evidence was presented that the federal prosecutors in Risha's case had "actual knowledge" of the key witness's expectation or of a pending plea agreement. The Court held that under certain fact findings, such knowledge might be imputed. Id. at 299.

In addressing the issue of cross-jurisdiction constructive knowledge, the questions that must be asked are " (1) whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control'; (2) the extent to which state and federal governments are part of a 'team,' are participating in a 'joint investigation' or are sharing resources; and (3) whether the entity charged with constructive possession has 'ready access' to the evidence." United States v. Risha, 445 F.3d at 304.

First, there is the question whether a party with actual knowledge of the impeachment information was under the federal government's control or acting on its behalf. See, e.g., Moreno-Morales v. United States, 334 F.3d 140, 146 (1st Cir. 2003) (finding that "the Puerto Rico Senate was not acting on behalf of the federal government"); United States v.

21

Leos-Hermosillo, No. 98-50546, 2000 WL 300967 at *3, 2000 U.S. App. LEXIS 5012 at *8 (9th Cir. Mar. 22, 2000) (holding that even though an officer "was not employed by ... the federal government, he was no less an agent of the federal government; he was acting on its behalf and subject to its control"). "What is at issue here, at least generally, is the intermingling of state and federal forces." Risha 445 F. 3d at 304. While the record is not clear on how much intermingling occurred, the Waterfront Commission explicitly states in their official report that they were involved in the investigative and prosecutorial planning of the matter at hand. (Commission Report). While it is unclear whether the Commission was under the federal government's control, it is clear it was acting on behalf of the federal government and its agents.

Related to the question whether an agent is acting on behalf of the government is the question whether the forces are part of a team or are engaged in a joint effort. See, e.g., United States v. Beers, 189 F.3d 1297, 1303-04 (10th Cir.1999); Moon v. Head, 285 F.3d 1301, 1310 (11th Cir.2002) (refusing to impute to a Georgia prosecutor evidence possessed by a Tennessee Bureau of Investigation agent because the agencies shared no resources or labor); United States v. Brooks, 966 F.2d 1500, 1503 (D.C.Cir.1992) (holding that the prosecution must search files of other branches of government if they are "closely aligned with the prosecution" or have a "close working relationship"). Here, it appears there is a close relationship between the state and federal government. The Waterfront Commission stated that it "led or significantly participated in investigations and prosecutions" that led to indictments, including the one at issue. (Commission Report).

The last question is whether the evidence in question was readily available to the prosecution. See, e.g., Kasi v. Angelone, 300 F.3d 487, 506 (4th Cir.2002); United States v.

22

<u>Auten</u>, 632 F.2d 478, 481 (5th Cir.1980). The Government plainly states in their brief that "the law enforcement officials working on their respective state and federal investigations did not have real-time access to the information gathered by the other." (ECF No. 223 at 62).

Balancing the above three inquiries, this Court finds that the federal government was in constructive possession of Waterfront Commissions "critical records, surveillance reports and photographs," and was "involved in the investigative and prosecutorial planning." (Commission Report). Based on the official report of the Waterfront Commission, it is clear that there was at the very least a cooperative investigation between state and federal agents, although it appears that the involvement was more coordinated, with the agencies sharing documents and information. Thus, this Court directs the Government to provide Defendants with any <u>Brady</u>, <u>Giglio</u> or Jencks Act material that they are in constructive possession of from the Waterfront Commission.

### E. Motion to Suppress Surplusage in the Indictment

S. LaGrasso moves to strike (1) Mob related words; (2) catch-all phrases; and (3) allegations of criminal activity from the Indictment. S. LaGrasso argues that the introduction of 'La Cosa Nostra,' 'Genovese Family,' 'Mafia,' and other mob and organized crime related names in the preamble to the Indictment will "unmistakenly cause the jury to unnecessarily and prejudicially consider the enterprise's name as some consciousness or evidence of guilt." He argues that as there are no allegations reciting any direct or indirect connections between Salvatore LaGrasso and 'La Cosa Nostra,' 'Genovese Family,'and the 'Mafia.,' the language should be stricken from the indictment. S. LaGrasso next moves to strike all vague, catch-all language, arguing that such language is irrelevant and allows the jury to draw improper

inferences. He moves to strike specifically the terms "numerous," "among other things," "various," "others," and "criminal activities." S. LaGrasso also moves to strike any allegations of criminal activity in the preamble which are not alleged to be a predicate racketeering act in the Indictment nor are alleged to be an overt act in furtherance of any conspiracy in the Indictment.

Dehmer moves to strike (1) the aliases in the caption of the indictment; and (2) any and all mention of La Cosa Nostra. The caption of the Indictment has included an alleged alias for nine of the fourteen defendants charged. Dehmer is listed as having an alias of "Dickie." He argues there is no reason to offer such name in the indictment, especially when some of the other defendants are given alias names to support a crime family image. Dehmer alleges there has been no showing that his alias is relevant, and thus should be stricken

Additionally the indictment, numbering 143 pages and 172 paragraphs, makes only four mentions of La Cosa Nostra, charging that La Cosa Nostra is the racketeering enterprise and that the alleged Genovese crime family was one of the crime families that constituted La Cosa Nostra. Such references are made in the introductory portion of the indictment. The remainder of the indictment focuses on the alleged members' actions and the actions of others. Dehmer alleges that no link between the alleged Genovese crime family and La Cosa Nostra other than the boilerplate language referenced above is mentioned: notably, beyond that initial assertion there is not even a further reference to La Cosa Nostra. Dehmer argues that there is no substantive link to La Cosa Nostra alleged, and thus any mention should be stricken from the indictment.

The Government argues that Defendants Dehmer and S. LaGrasso seek merely to sanitize the Indictment "without reference to controlling law, and in fact they cannot point to any allegation in the charging instrument that is irrelevant and prejudicial." (ECF No. 223 at 37).

24

A district court may strike surplusage from the indictment or information.  FED. R. CRIM. P. 7(d). "This rule introduces a means of protecting the defendant against immaterial or irrelevant allegations in an indictment or information, which may, however, be prejudicial." Fed. R. Crim. P. 7(d) Advisory Committee's Note.  In United States v. Hedgepeth, 434 F.3d 609, 612 (3d Cir. 2006), the Court of Appeals clarified that Rule 7(d) is to be read in the conjunctive.  As stated by the Third Circuit:

> Logic demands the conjunctive standard: information that is prejudicial, yet relevant to the indictment, must be included for any future conviction to stand and information that is irrelevant need not be struck if there is no evidence that the defendant was prejudiced by its inclusion.

Id. The court held that a court may only "strike surplusage from the indictment or information when it is both irrelevant (or immaterial) and prejudicial." Id.  Accordingly, motions to strike surplusage are rarely granted.  United States v. Aguilar, 256 F. Supp. 2d 306, 317 (D.N.J. 2003). This rarity is due to the "exacting standard" described above. See United States v. Giampa, 904 F. Supp. 235 (D.N.J. 1995).

This Court does not find the information in the Indictment to be both irrelevant and unfairly prejudicial. Thus, Defendants motions are denied.

### F. Motion for Leave to File Additional Motions

Pursuant to ongoing discovery, this Court grants Defendants leave to file additional motions if they become necessary.

### G. Dehmer's Motion to Dismiss Counts 1 and 2

Dehmer moves to dismiss Count 1 and 2 as they pertain to him because he alleges that the charges do not explain how he participated in the affairs of the enterprise through a pattern of

racketeering activity. The first 137 racketeering acts in the Count One RICO conspiracy covers 23 pages of the indictment and alleges extortionate acts by co-conspirators involving the ILA but no mention is made of Dehmer.

The Government argues that both Counts contain the elements of the offenses intended to be charged, apprise Dehmer of what he must be prepared to meet, and would allow him to plead double jeopardy in the event of a subsequent prosecution. The indictment makes plain that it is Dehmer's commission of specific criminal acts in furtherance of the long-term goals of the alleged enterprise that constitute his violation of RICO. The Court agrees with the Government's position, and Dehmer's motion to dismiss is denied.

### H. Dehmer's Motion to Exclude Expert Testimony

The Government proposes to present the testimony of an expert in the field of organized crime. Dehmer argues that testimony on La Cosa Nostra is not required for the jury to be able to evaluate the alleged actions of Dehmer and the others, or even to assess their alleged organization as a crime "family." This evidence will, instead, he alleges, confuse the jury by adding layer upon layer of evidence that is unrelated to the factual allegations of Mr. Dehmer and others. He claims such an expert would serve no probative value and only serve to unduly prejudice him and the others.

At trial, the Government maintains it will offer agent expert testimony about the internal operating rules of organized crime families, see United States v. Pungitore, 910 F.2d 1084, 1148–49 (3d Cir.1990), the identification of members of the Genovese and other crime families involved in this case, see United States v. Locascio, 6 F.3d 924, 936 (2d Cir.1993), as well as rules of conduct of organized crime members and associate, their code of silence, and the

meaning of certain relevant jargon. See United States v. Riccobene, 709 F.2d 214, 230- 31 (3d
Cir. 1983), overruled on other grounds by Griffin v. United States, 502 U.S. 46 (1991).

The essential elements for conspiracy to violate RICO requires proof that the "defendants
knowingly agreed to participate in the 'enterprise' through a pattern of racketeering."  Riccobene,
709 F.2d at 220-21.  In Count Two, the government must prove beyond a reasonable doubt that
the charged defendants, being associated or employed by the enterprise alleged in the
Superseding Indictment, collected an "unlawful debt."  18 U.S.C. §1962(d).

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme
Court explained, "Rule 702 further requires that the evidence or testimony 'assist the trier of fact
to understand the evidence or to determine a fact in issue.' This condition goes primarily to
relevance." Id. at 591.  Although the proffered expert testimony must be relevant, or "fit," an
issue to be determined by the jury, In re TMI Litigation, 193 F.3d 613, 670 (3d Cir. 1999), the
Third Circuit has repeatedly expressed the view that the standard for this relevancy factor "is not
that high." In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 745 (3d Cir. 1994).  Here, the
proffered expert agent testimony precisely "fits" with issues of fact that must be determined by
the jury as to Counts One and Two. Thus, assuming the Government properly qualifies the
expert, such testimony will be permitted.

**I. Dehmer's Motion for a Pretrial Hearing on Co-Conspirator Statements**

Dehmer also moves for a pretrial hearing to determine the admissibility of co-conspirator
statements. Before admitting any out of court conspirator statement, the court must first
determine that the government has "established the existence of the alleged connection of each
defendant with it by a clear preponderance of the evidence independent of the hearsay

declarations." <u>United States v. Continental Group, Inc.</u>, 603 F. 2d 444, 457 (3d Cir. 1979), <u>cert. denied</u>, 444 U.S. 1032 (1980).

The Third Circuit has explained that co-conspirator statements may be introduced at trial "without a prior showing of a conspiracy based on independent evidence, subject to the requirement that the government make such a showing by the close of its case." <u>United States v. Ammar</u>, 714 F.2d 238, 246 (3d Cir. 1983). The Government argues that a pre-trial hearing would amount to a mini trial outside the presence of a jury; given the nature of the testimony regarding the conspiracy, it would be forced to present most of its case-in-chief in order to show the participation of the defendant and declarant in an ongoing conspiracy. The Court agrees; there is no need for a pre-trial hearing, and thus Dehmer's motion is denied.

**J. Ruiz's Motion asking this Court to  revisit its prior ruling preventing him from communicating in any manner with anyone at the pier**

At this time the Court declines to revisit its prior ruling, and the order preventing Ruiz from communicating in any manner with anyone at the pier stands.

**K. Ruiz's Motion to Dismiss Count 90 for Improper Venue**

Count 90 charges Ruiz with obstruction of justice in connection with a federal grand jury investigation being conducted in the Eastern District of New York. Ruiz argues there is "no indication in the Count itself or in any other material provided to counsel to indicate that venue is proper for this Count in the District of New Jersey.

As the Government points out, the statute expressly permits the prosecution to be venued in New Jersey: "A prosecution under this section or section 1503 may be brought in the district in which the official proceeding . . . was intended to be affected or in the district in which the

28

conduct constituting the alleged offense occurred." 18 U.S.C. § 1512(i) The Government alleges that it expects that the trial evidence will prove that Ruiz, when he became aware of law enforcement's investigation into the New Jersey waterfront, engaged in conduct in New Jersey to conceal evidence representing proceeds of the extortions. Accordingly, Ruiz's motion to dismiss is denied.

## IV.    CONCLUSION

For the reasons stated above, it is the finding of this Court that Defendants pretrial motions are **denied in part, granted in part**. An appropriate Order accompanies this Opinion.


Dennis M. Cavanaugh, U.S.D.J.


Dated:       February 20, 2013
Original:    Clerk's Office
cc:          All Counsel of Record
             File

29